**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**DONALD COOPER,**

      **Plaintiff,**

**vs.**                          **Case No. 4:08cv479-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be reversed and the Commissioner be ordered to grant Plaintiff's applications for benefits.

**Procedural status of the case**

Plaintiff, Donald Cooper, applied for disability insurance benefits.  His last date of insured status for disability benefits is December 31, 2009.  Plaintiff was 42 years old at the time of the administrative hearing (on May 21, 2007), has a 12th grade education,

and has past relevant work as a truck driver, sawmill supervisor, and a lay-up line operator. Plaintiff alleges disability due to neck and back injuries, and consequent pain. The Administrative Law Judge found that Plaintiff's degenerative disk disease, status post cervical and lumbar spine surgeries, and hypertension, were "severe" impairments, but that Plaintiff had the residual functional capacity to perform light work with limitations. R. 23. The ALJ found that Plaintiff could not return to his past relevant work, but could perform light work as a cashier, photo processor, or a ticket seller, and thus was not disabled. R. 27-28.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. <u>Barnhart v. Walton</u>, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or
      equal those listed in Appendix 1 of 20 C.F.R. Part 404?

      4.      Does the individual have any impairments which prevent past relevant work?

      5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[1]

Plaintiff testified that he was injured in a truck wreck in June, 2004. R. 429. He was in significant pain, and after an MRI, he was told he needed surgery. R. 430-31. He had surgery for his neck in November, 2004, and for his back in December, 2004.

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link). Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html. The pages at these websites are not attached to this report and recommendation because the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

R. 416.  He said that he had not seen a neurologist since June 14, 2006, when his insurance was cancelled.  R. 417.

Plaintiff said that he still had pain after his neck operation.  R. 418.  He said that he still experiences pain in his lower back that runs down through his buttocks to his left ankle.  *Id*.  Plaintiff also had pain in his neck radiating down his left shoulder.  R. 419.

Plaintiff said he thought he could walk only 20 or 30 yards.  R. 419.  He said that Dr. McKay in Thomasville[2] had told him he could use a cane.  R. 417-418.  He could walk without his cane, but a spasm and pain has caused him to fall.  R. 428.  He had such spasms about three times a week.  R. 429.  He could pick up a gallon of milk, but felt the pressure on his back.  R. 419.  He thought he could repetitively lift 5 pounds.  *Id*.  He said he could sit for only about 20 minutes, and had to take medication "to do those twenty minutes."  R. 421.  He said that his medications make him sleepy.  R. 422.

Plaintiff said that he had never done any office work, computer work, or the like.  R. 421.  He had worked as a plywood supervisor, as a motor vehicle mechanic taking out parts, and a long haul truck driver.  R. 420.

Plaintiff said he arises each morning at 4:00 a.m. and then sleeps in a recliner chair.  R. 422.  He then wakes and walks around at about 4:45 a.m.  He said he helps his wife fold clothes, but does not do any heavy lifting.  R. 423.  He said that he more or less sits in the house and tries to bear the pain.  R. 423-424.  He watches television about two hours a day.  R. 424.  He cannot concentrate at times due to pain.  R. 425.  He naps about four times a day for about 30 to 45 minutes each time.  R. 424.  He

---

[2] The transcript erroneously reports this as Dr. Mackary in Tunnellsville.  R. 417.

sleeps during the day due to the medications. *Id.* He sometimes visits with friends in his home. R. 426.

Plaintiff said he was referred to Dr. McKay to try to identify some training that he might need to be able to go back to work. R. 437-438.

Plaintiff said he still had his driver's license, and he drove about twice a week. R. 442. He drove four or five miles from his residence to Quincy, Florida, the nearest town. *Id.*

The ALJ noted that the records contained a notation that Plaintiff had muscle wasting, but Plaintiff's attorney said he did not know what that meant. R. 445. The Plaintiff did not know what the doctor was talking about. R. 446. The ALJ looked at Plaintiff and determined that he had no muscle wasting. *Id.*

The ALJ called a vocational expert as a witness. R. 447. He posed a hypothetical to the expert, incorporating the residual capacity finding generally described above and more specifically ahead. R. 448-449. The expert said that such a person could not do Plaintiff's past relevant work. R. 449. The expert said such a person could do light work as a cashier II, photographic processor, and ticket seller. R. 450. The expert said, however, that if such a person had to use a cane to walk from place to place, the person's ability to do these three jobs were be significantly diminished. R. 451. The expert said that having to use a cane would cause the person to be unable to do two-thirds of the ticket seller jobs, and even fewer of the other jobs would be left for the person to do. R. 453. The expert said: "There are very few jobs in the economy that a person without bimanual dexterity can do . . . ." R. 454. The expert said that since most cashier jobs require that a person stand all day, having to employ a

sit or stand option would significantly erode those jobs. *Id*. The expert said that the photo processor job was a sitting and standing job. R. 455.

The expert said that the cashier job had an SVP 2,[3] with reasoning skills at level 3, math skills at level 2, and language skills at level 2. R. 456. The cashier job is not considered to be a skilled position. *Id*.

**Medical evidence**

On June 14, 2009, Plaintiff was driving a tractor-trailer when he was involved in an accident on Interstate 85. R. 68. The truck overturned and struck several "mature pin trees." R. 69. He was observed in the emergency room for three hours. R. 127. He was discharged with several diagnoses, including cervical and lumbar strain, and left shoulder contusion. R. 128.

On August 12, 2004, Plaintiff was examined on a consultative basis by Kirk J. Mauro, M.D., for "an independent medical evaluation." R. 233. Dr. Mauro reviewed records from Dr. Cross, a chiropractor. *Id*. Dr. Mauro noted an MRI of Plaintiff's left shoulder on August 2, 2004, which showed mild degenerative changes and appeared to be normal. *Id*. Plaintiff complained of recurrent pain in his neck, thoracic, and lumbar spine, and said he had not returned to work. *Id*. Plaintiff "admitted" that he was "independent with feeding, grooming, dressing and bathing." *Id*. His wife did all of the house work. *Id*. Plaintiff said he was trained as a truck driver instructor. R. 234.

---

[3] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." SSR 00-4p.

On physical examination, Dr. Mauro found that rotation of Plaintiff's neck caused pain on the left.  R. 234.  His right shoulder, bilateral elbows, writs, fingers, hips, knees, and ankles all had full passive movement.  *Id*.  Plaintiff could bend forward only until his fingertips were two inches distal to (below) the patella.  *Id*.  Trigger points were found in the left paracervical area which radiate towards the left shoulder.  *Id*.  There was bilateral paralumbar spasm, worse on the left.  *Id*.  Straight leg raising was negative at 90 degrees.  *Id*.  Dr. Mauro's impression was a "musculoligamentous injury to the paracervical, parathoracic and paralumbar spine, with left shoulder bursitis and intermittent left hemibody dysesthesias."  *Id*.  Dr. Mauro found that Plaintiff was not at a state of maximum medical improvement related to his accident, and needed treatment, including physical therapy and medication.  *Id*.  Dr. Mauro found that the current chiropractic treatment did not seem to have been effective.  R. 235.  MRI studies of the spine were also recommended.  *Id*.  Dr. Mauro concluded that Plaintiff was not then capable of employment due to the restricted range of his left shoulder and recurrent pain.  *Id*.  He said it would not be safe for Plaintiff to drive a semi-tractor trailer.  *Id*.

On September 26, 2004, Plaintiff had an MRI of his spine.  R. 358.  A small disk protrusion was found at C3-4.  *Id*.  Disk herniation at C6-C7 had the potential to impinge the left C7 nerve root sleeve.  *Id*.  There was a "rather large extruded left paracentral disk herniation at L4-5 which produces moderate canal narrowing" that was expected to impinge upon the left L5 nerve root sleeve.  *Id*.

On October 5, 2004, Plaintiff was seen by Christopher S. Rumana, M.D., at the request of James T. Martin, M.D.  R. 226.  Dr. Rumana found on examination that Plaintiff stood "somewhat bent forward at the waist."  R. 228.  When he stood straight or

arched his back somewhat, Plaintiff had "markedly increasing pain shooting down his left leg to his leg ankle." *Id.* Plaintiff apparently had a positive straight leg test on the left. *Id.* His gait was steady. *Id.* Dr. Rumana's impression after review of the MRI was left L5 radiculopathy, central and left-sided L4-L5 disk herniation, and cervical and thoracic spondylosis. R. 228-229. Dr. Rumana recommended lumbar surgery. R. 229.

On October 19, 2004, Plaintiff underwent a lumbar myelogram. R. 339. Mild degenerative disk height loss was noted at L4-L5, with "associated amputation of both L5 nerve root sleeves at the disk level." *Id.* A mild extradural impression on the ventral sac was also observed at L3-L4. R. 340. The impression was "High-grade and central canal and lateral recess stenosis[4] at L4-5, presumably secondary to a large disk protrusions of extrusion." *Id.* A lumbar CT scan on the same day revealed "moderate to severe compression of the sac and visible compression of both L5 nerve roots." R. 347.

A cervical myelogram the same day, October 19, 2004, revealed "possible dorsal disk protrusion at C4-5." R. 341. A cervical CT scan revealed "moderate sac and cord compression" at C6-C7, but apparently without impingement of the exiting nerve roots. R. 348.

On October 26, 2004, after review of the myelograms, Gerald N. Kadis, M.D., determined that Plaintiff first needed cervical surgery and then lumbar surgery. R. 311. He discussed this with Plaintiff and his family. *Id.*

_____

[4] Stenosis is an abnormal narrowing of a duct or canal. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On November 4, 2004, in a preoperative examination, Dr. Kadis noted that Plaintiff's experience of pain was consistent with the myelograms of the cervical and lumbar spine. R. 351. He said that Plaintiff "clearly has cord and root compression on his cervical myelogram." *Id.* It was observed that Plaintiff had a "severe antalgic gait." R. 352. It was Dr. Kadis's impression that Plaintiff had cervical cord compression and radiculopathy at C6-7 and stenosis in the lumbar canal at 3-4 and 4-5. *Id.* The plan was "anterior corpectomy and fusion C6-7 with fusion and plating." *Id.* On the same day, Dr. Kadis performed an anterior cervical corpectomy at C6 and C7 with interbody fusion and plate stabilization. R. 332. It was reported that Plaintiff had immediate relief from pain. *Id.* Dr. Kadis noted that Plaintiff also had "high grade lumbar stenosis with two level block and will be coming in at a later date for posterior lumbar decompression and stabilization." *Id.*

On November 12, 2004, Dr. Kadis said that Plaintiff was doing "quite well" after his first surgery. R. 310.

On December 9, 2004, Plaintiff was seen by John K. McKay, Ph.D. R. 230. Dr. McKay specializes in vocational evaluation, and is a Licensed Rehabilitation Psychologist. *Id.* and R. 380. Dr. McKay said that Plaintiff's voice and movements "all indicated significant discomfort." R. 230. Dr. McKay said that Plaintiff was optimistic, and "wants to return to work as soon as possible." R. 231. He wanted to return to truck driving, "if at all possible," but Dr. McKay noted that Dr. Kadis was skeptical. *Id.* Dr. McKay thought that Plaintiff would "definitely" have some vocational loss, though the extent could not yet be know. *Id.* Dr. McKay thought he would know more after testing, when Plaintiff was in a better physical condition to concentrate. R. 230.

On December 10, 2004, Plaintiff was still doing well with his neck surgery, but was miserable from pain in his lower back. *Id.* Lumbar surgery was scheduled by Dr. Kadis. *Id.*

On December 20, 2004, Dr. Kadis examined Plaintiff before the lumbar surgery. R. 256. Dr. Kadis said that most of Plaintiff's complaints seemed to emanate from his lumbar region. *Id.* Dr. Kadis noted that x-rays revealed that Plaintiff had "a huge extrusion at L4-5 with high-grade stenosis at 3-4 and 4-5." R. 257. On December 21, 2004, Plaintiff had a bilateral L3-L4 laminectomy for stenosis, a bilateral L4-L5 transpedicular discetomy for a herniated disc and stenosis, a posterior lumbar interbody fusion at L4-L5, a pedicle screw stabilization at L4-L5, and a bilateral fusion at L3 to L5. R. 263.

On December 31, 2004, Dr. Kadis planned to have Plaintiff involved with physical therapy. R. 310. Plaintiff was having some difficulty sleeping at night, was to use the recliner, and Ambien was prescribed. *Id.*

Plaintiff was evaluated for commencement of physical therapy on January 12, 2005. R. 330. Plaintiff complained of anterior thigh numbness and pain, as well as cervical stiffness and soreness. R. 331. His potential for rehabilitation as thought to be good. *Id.* The long term goal was to achieve a gait for community distances using a straight cane and left rip strength of 70 pounds. R. 330.

On January 24, 2005, Dr. Kadis said that x-rays of Plaintiff's spine looked "very good," and Plaintiff was getting his strength back. R. 309. Dr. Kadis said that Plaintiff needed to build strength in his lower extremity. *Id.* Plaintiff's main complaint that day

was aching in his hip joints and weakness in his quadriceps femoris. *Id.* It was noted

that he was now free of all radicular pain, which was a good sign. *Id.*

On February 21, 2005, Dr. Kadis noted that Plaintiff had a "little burning in his

thighs and in his neck." R. 309. Dr. Kadis said that Plaintiff was "doing remarkably

well" and he was optimistic about his recovery. *Id.*

On March 7, 2005, Plaintiff reported to Dr. Kadis that the hyperextension activity

he was doing in physical therapy was "clearly aggravating him," and Dr. Kadis agreed

that Plaintiff should stop that exercise. R. 309. Dr. Kadis prescribed Percodan.[5] *Id.*

On March 21, 2005, Dr. Kadis said that Plaintiff was still doing quite well, but had

some burning in his side, especially at night. R. 309. He prescribed Gabitril.[6] *Id.*

On April 25, 2005, Plaintiff was discharged from physical therapy. R. 325. It was

noted that the rehabilitation goals had been achieved, and he had reached maximum

rehabilitation potential. *Id.* Plaintiff reported continued pain. *Id.* Plaintiff had attended

physical therapy without missing a scheduled day, attending 75 times, from late

January, 2005, through April 20, 2005. R. 326-324.

On April 29, 2005, Dr. Kadis reported that Plaintiff was generally doing quite well,

though he still had burning and soreness in his thigh muscle. R. 308. He was losing

weight, and "doing a good bit of walking." *Id.* Dr. Kadis increased the dosage of Gabitril

---

[5] Percodan is prescribed for moderate to moderately severe pain. Percodan is a combination of two pain-killing drugs – oxycodone and aspirin. Oxycodone (related to codeine) is in a class of drugs called narcotic analgesics; it relieves pain. Aspirin is a less potent pain reliever, as well as an anti-inflammatory and a fever reducer. Aspirin increases the effects of oxycodone. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[6] Gabatril is indicated as add-on therapy in adults and children 12 years and older for the treatment of partial seizures. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

and prescribed Darvocet.[7]  *Id.*  Dr. Kadis thought that Plaintiff would be able to return to

his job as a truck driver in two months.  *Id.*

On May 31, 2005, Plaintiff was examined on a consultative basis by Arthur

Pasach, M.D., for a worker's compensation permanent impairment rating.  R. 304.  It

was noted that at the time of Plaintiff's injury, he was a passenger in the truck as an

instructor, teaching a student to drive.  *Id.*  The student driver fell asleep and the truck

rolled over.  *Id.*  Plaintiff sustained injuries to his cervical and lumbar spine.  *Id.*  After

the two surgeries, Plaintiff reported that he still had some stiffness and "discomfort" in

his neck when he moved it.  *Id.*  He said that he had substantial relief from pain in his

lower back after surgery, but continued to experience pain and numbness in the anterior

thighs bilaterally, and his left side occasionally gave way.  *Id.*  Plaintiff said he took

Topamax[8] at bedtime and Darvocet 100 four times daily, and got "considerable relief"

with those medications.  *Id.*  Plaintiff said he estimated he could walk a mile and tried to

do that daily.  *Id.*  He said he could stand for 20 minutes and could sit for an hour.  *Id.*

He could climb steps "with difficulty."  *Id.*  He could drive a motor vehicle for about an

hour.  *Id.*  He was able to undress, dress, and climb up on the examination table.  *Id.*

He walked with a normal gait, could squat and recover as well.  *Id.*  He could bend

forward at the waist, but was unable to extend and his lateral bending was limited to no

---

[7] Darvocet-N is used for the relief of mild to moderate pain, with or without fever.
PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[8] Topamax is an antiepileptic drug, prescribed to control both the mild attacks known
as partial seizures and the severe tonic-clonic convulsions known as grand mal
seizures.  It is typically added to the treatment regimen when other drugs fail to fully
control a patient's attacks.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

more than 2 or 3 degrees.  R. 305.  Dr. Pasach had the "impression of a mild atrophy of

the left thigh as compared to the right," but this was difficult to determine in a man of

Plaintiff's size.  *Id.*   Plaintiff had nearly full range of motion of his cervical spine, but

expressed discomfort at extremes.  *Id.*  Dr. Pasach thought that Plaintiff was "already at

maximum medical improvement," though he might improve more if he lost more weight.

*Id.*  He rated Plaintiff's whole body permanent impairment at 29 percent.  *Id.*

On June 27, 2005, Dr. Kadis said that Plaintiff was still having some pain in his

lower back and thighs, but found that Plaintiff was "generally looking much better."  R.

303.  Dr. Kadis recommended another month of daily physical therapy in an effort to get

Plaintiff back to work.  *Id.*

On August 2, 2005, Plaintiff looked generally stiff to Dr. Kadis.  R. 303.  He had

not been able to do his therapy because he had to go out of town.  *Id.*  He prescribed

Celebrex[9] and more physical therapy.  *Id.*

On August 31, 2005, Plaintiff was again discharged from physical therapy, having

attended 8 of 8 scheduled appointments beginning on August 8, 2005.  R. 318.  He had

decreased his experience of pain from 5 to 2 out of 10, and had increased his range of

motion and strength by 20 percent.  *Id.*  He had also achieved the goal of being able to

walk a quarter of a mile (440 yards) in 10 minutes or less.  *Id.*

---

[9] Celebrex is prescribed for acute pain, menstrual cramps, and the pain and
inflammation of osteoarthritis, ankylosing spondylitis (rheumatoid arthritis of the spine),
and rheumatoid arthritis.  It is a member of a new class of nonsteroidal anti-
inflammatory drugs (NSAIDs) called COX-2 inhibitors.  PDRhealth™, PHYSICIANS
DESKTOP REFERENCE.

On September 9, 2005, Dr. Kadis said that Plaintiff continued to "do remarkably well," though he still had "a little bit of stiffness in his left leg and left arm, but has [benefitted] from therapy." *Id.*

On October 3, 2005, Dr. Kadis reported that Plaintiff was having some pain around the lateral aspect of his left hip, and he found him to be "quite tender on the lateral aspect of his left hip." R. 303. Dr. Kadis thought that Plaintiff had tronchanteric bursitis, that is, bursitis of the thigh muscles. *Id.*

On November 8, 2005, Dr. Kadis said that Plaintiff was having increasing amounts of low back pain radiating into his left buttock. R. 302. A follow-up MRI was scheduled. *Id.*

The MRI on November 11, 2005, revealed a central disk bulge with protrusion causing central canal narrowing and right-sided neural foraminal narrowing at L3-L4, and "some mild enhancing epidural scar tissue surround the exiting left L5 nerve root" that "may cause some of the patient's symptomatology." R. 248.

On November 15, 2005, Dr. Kadis said that the MRI scan showed that Plaintiff had some lateral recess stenosis to the right at L3-L4. R. 302. While the fused area at L4-L5 looked "quite good," Dr. Kadis found that Plaintiff "does have some lateral encroachment to the right at L3-4." *Id.* An epidural steroid was prescribed. *Id.*

On November 21, 2005, Dr. Kadis attempted to give Plaintiff an epidural. R. 243. Dr. Kadis noted that there were signs of right L3-L4 impingement and said that Plaintiff's pathology "has now begun to develop some symptoms above where he has had his previous surgery." *Id.* He said that Plaintiff was having increasing pain radiating into his hip and buttock. *Id.*

On December 5, 2005, Dr. Kadis administered an epidural injection. R. 240. On December 30, 2005, Dr. Kadis said that Plaintiff was having non-radicular pain between his shoulder blades and neck. R. 302. An RS stimulator was prescribed. *Id.*

On January 26, 2006, Dr. Kadis filled out a "supplementary attending physician's statement" for a "trucker occupational accident" with respect to Plaintiff's worker's compensation claim. R. 307. He said that Plaintiff was "permanently disabled" from doing any "duties of occupation," apparently meaning Plaintiff's past relevant work as a truck driver, and his prognosis was fair. *Id.* The diagnosis was lumbar radiculopathy. *Id.*

On July 20, 2006, Plaintiff was referred to Nicodemo Macri, M.D., for a consultative neurological examination. R. 396. Plaintiff reported that initially his left upper extremity was better after surgery, but was now very stiff and he had pain down both arms that radiated and kept him up at night. *Id.* He also had give-way weakness on the left side in his lower back and the pain was enough that he was not able to sleep in his bed. *Id.* Plaintiff was then taking Vicodin[10] three times a day, Darvocet, and Topamax. *Id.* Dr. Macri noted that Plaintiff had "undergone a significant amount of physical therapy during this entire period" and had reached maximum medical improvement. R. 397. Dr. Macri also note a functional capacity assessment that had been done on July 6, 2006, finding that Plaintiff could perform light work for an eight hour day. *Id.* Dr. Macri felt that these limitations were proper, after reviewing his

---

[10] Vicodin is a brand name for hydrocodone. Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

"chart." *Id.* Dr. Macri said that Plaintiff had gait problems, and walked with a cane with poor posture. *Id.* He said that Plaintiff's range of motion in the lumbar spine is severely decreases in all planes. *Id.* He noted "intrinsic wasting" in Plaintiff's feet and upper extremities. *Id.* Plaintiff could not climb upon the examination table. *Id.* Plaintiff could not do straight leg raising lying down. *Id.* Dr. Macri determined that Plaintiff had a 28% total body impairment rating. R. 398. Dr. Macri suggested that Plaintiff try Trazodone,[11] and continue with flexibility exercises, weight control, and increasing his cardiovascular endurance. *Id.*

On July 31, 2006, Plaintiff saw his family practitioner, Chokiert Emko, M.D. R. 387. He had sinus headaches, and left abdominal pain that extended around the back. *Id.* Dr. Emko made note of Plaintiff's accident in 2004, that he no longer worked, and was permanently disabled. *Id.* He said that Plaintiff walked into his office without a cane. *Id.*

On August 7, 2006, Plaintiff was seen by Dr. Emko. R. 386. Plaintiff was "feeling better in general" and his back was "ok." *Id.* He was then taking Trazodone and Vicodin. R. 388.

On August 15, 2006, Dr. Emko noted that Plaintiff had had left side pain all day, better after 3 p.m. R. 385. Plaintiff walked in with a cane. *Id.* His abdomen was not tender. *Id.*

---

[11] Trazodone hydrochloride, sold as Desyrel, is an antidepressant. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

On September 11, 2006, Dr. Emko again saw Plaintiff.  R. 385.  Dr. Emko noted

that Plaintiff would see Dr. Macri, the neurologist.  *Id.*  It appears that Dr. Emko said he

had no stomach pain any longer.  *Id.*  He said Plaintiff's back was ok.  *Id.*

On October 23, 2006, Plaintiff again was interviewed by Dr. McKay.  R. 376.  Dr.

McKay received updated records.  *Id.*  Dr. McKay said that when Plaintiff finished high

school in 1983, he went to work in Havana, Florida, for Coastal Lumber, and by 2003,

was a "working" supervisor, working and supervising 20 other workers.  *Id.*  The job

required moderate to heavy lifting, with constant standing and walking.  *Id.*  Plaintiff then

enrolled in a truck driving program, and was injured during that program when a trainee

fell asleep as he was driving.  *Id.*  Dr. McKay said that Plaintiff could drive his car and

"go about his daily activities in a very deliberate manner," but "he functions within a

partial range of sedentary or light exertion only."  R. 377.  Dr. McKay explained:

> A detailed description of his daily activities does not comport with any
> evaluations suggesting that he can somehow sustain activity during the
> course of any day.  In fact, he has rest intervals and is up and down each
> and every day.  He sleeps in a recliner chair and is often irritable and tired
> during the day.  He does not have any days whatsoever in which he is
> pain free.  He was observed walking in my office using a cane, although
> he doesn't use it all of the time.  He has difficulty with prolonged sitting and
> shifts his posture to manage his discomfort.  He reports that his pain
> worsens after even modest exercise or activity.

R. 377.  He said that:

> [H]is activities would suggest a partial range of sedentary exertion only as
> he is not able to stand and walk on any consistent basis and spends much
> of his time either sitting or reclining.  He functions more like an older
> individual with chronic ailments.

R. 378.  Plaintiff was substantially discouraged because he had not been able to

recuperated as he had anticipated.  *Id.*

On testing, Dr. McKay found Plaintiff to be "profoundly low in reading and spelling," and was low in arithmetic, but can do fundamental calculations. R. 377. His reading was at the 7th grade level, and his arithmetic was at the 8th grade level. *Id*. He scored at the 6th grade level in mechanical aptitude. *Id*.

Dr. McKay said that on further testing, Plaintiff showed interest in "realistic" occupations requiring good physical skills and average or above average exertional capacity, but Dr. McKay thought he could not perform such jobs. R. 377. He showed interest in "enterprising" jobs (sales), but Dr. McKay thought that those jobs require "far more education and verbal skills" than Plaintiff has. *Id*.

Dr. McKay said that Plaintiff has "unremitting neck and back pain." R. 378. He said that Plaintiff has left sided weakness going down his left leg and has very little sensation in his left foot. *Id*. He found him to be irritable, short tempered, and depressed, and was currently treated for depression. *Id*. Plaintiff disliked taking narcotic pain relievers, and had stopped, taking only Aleve "unless he has an acute pain event." *Id*. Dr. McKay said that Plaintiff did not drink alcohol, did not smoke, and impressed him as "a conservative family man who has been dislocated from the competitive labor market due to his impairments and for no other reason." *Id*. He noted that Plaintiff had lost weight, from 337 pounds to 276 pounds,[12] a loss of 61 pounds, but "this was not very helpful in making him employable or more functional." *Id*. Dr. McKay said that Plaintiff had had "an excellent work history." *Id*.

---

[12] Plaintiff is a large man, 6' 2" tall. R. 377.

Dr. McKay concluded that Plaintiff was capable of performing only partial sedentary work. R. 379. Even then, due to his low academic skills, he would not be suitable for the vast majority of sedentary office jobs, and he has no skills that would be transferrable to such work. *Id.* Dr. McKay said that Plaintiff was at risk "for exacerbation of his pain even upon modest activity." *Id.* He had suffered a profound loss of his daily activities, and was limited also by depression, which had become "quite profound" since Dr. McKay first met Plaintiff, on March 10, 2005.[13] *Id.* Dr. McKay found Plaintiff to be honest, straightforward, sincerely wanting to work, and not a malingerer. *Id.*

On November 16, 2006, Dr. Macri saw Plaintiff. R. 395. Plaintiff still had radicular symptoms, mostly in his left leg. *Id.* Dr. Macri ordered a new MRI. *Id.* Apparently Dr. Macri had prescribed methadone because he noted that methadone did not get rid of Plaintiff's pain. *Id.* Darvocet was prescribed. *Id.* Desyrel was also prescribed to help Plaintiff sleep. *Id.* Dr. Macri noted that Dr. Emko was a family practice physician in Quincy, Florida, and he referred Plaintiff to Dr. Emko and Dr. Kadis. *Id.*

On February 15, 2007, Plaintiff saw Dr. Emko. R. 384. He had had left side body pain for two weeks and low back pain. *Id.* Dr. Emko ordered another MRI of Plaintiff's lower spine. R. 384 and 388.

On February 22, 2007, Plaintiff had another MRI. R. 79. The MRI revealed the postoperative changes at L4-L5, without foraminal narrowing, and "mild to moderate

---

[13] Dr. McKay actually first saw Plaintiff on December 9, 2004. R. 230.

spinal stenosis at L3-4 where there is a small central disc protrusion superimposed on a broad-based bulge." *Id.* There was also mild right foraminal narrowing at L5-S1. *Id.*

On March 1, 2007, Dr. Emko noted that Plaintiff still had left leg and left side pain. R. 384. Plaintiff was using a straight cane, and could not do straight leg raising. *Id.* Dr. Emko's assessment was chronic low back pain and obesity. *Id.* He referred Plaintiff to a pain neurologist for a second opinion. *Id.*

On March 16, 2007, Dr. Emko noted that Plaintiff had an appointment on April 3, 3007, with another doctor for chronic back pain. R. 384. Dr. Emko filled out a form expressing an opinion as to Plaintiff's condition. R. 78. He said that Plaintiff's last office visit was on March 1, 2007. *Id.* Dr. Emko said that Plaintiff could work with restrictions, but the restrictions were severe. *Id.* He said that Plaintiff could not sit for more than 15 minutes at a time, could not stand or walk for more than 20 to 30 minutes, and cannot bend. *Id.* He then checked the box indicating that Plaintiff was unable to work. *Id.* He said that "the pain is too severe at this point and he stays medicated [with] pain meds." *Id.* He said that Plaintiff could not participate in other activities, such as classroom or volunteer work, because he is in too much pain and cannot sit, stand, walk, or bend. *Id.* He said that Plaintiff's condition was permanent. *Id.* He referred Plaintiff to a neurologist. *Id.*

On November 7, 2007, Plaintiff had another MRI of his spine. R. 9-11. At L3-L4 there was a bulging annulus and a more broad-based central ventral extradural defect that flattened the ventral thecal sac and contributed to moderate canal stenosis. R. 9-10. It was noted that this could be a disc protrusion or postoperative scarring or fibrosis, and a contrast study was recommended. R. 10.

**Legal analysis**

### Whether the ALJ should have specified the frequency of the sit or stand option

The ALJ determined that Plaintiff has the residual functional capacity to perform light work "with a sit/stand option," no climbing of ropes, ladders, scaffold, and avoidance of unusual workplace hazards and dangerous machinery. R. 22-23. The ALJ then asked the vocational expert to consider a hypothetical person who "could do sitting or standing at will." R. 449. Plaintiff argues that this was error because Social Security Ruling 96-9p requires that the residual functional capacity assessment "must be specific as to the frequency of the individual's need to alternate sitting and standing."

Social Security Rule 96-9p provides in part:

> **Alternate sitting and standing**: An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled *sedentary* work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. *The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.* It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

SSR 96-9p (emphasis added). Plaintiff argues that an "at will" sit or stand option does not set forth the frequency of using the option.

Social Security Rule 96-9p relates to the "implications of a residual functional capacity for less than a full range of sedentary work." By its title, it does not apply to a claimant with a residual functional capacity for a limited range of light work. The Commissioner's rules define "light work" in part:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, *a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls*. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b) and 416.967(b) (emphasis added). In other words, a claimant who can do light work is ordinarily expected to be able to do "a good deal of walking or standing." *Id.* "Thus, a finding that the plaintiff could perform light work would encompass the ability to change positions frequently." Wekwert v. Astrue, 2009 WL 700599, *3 (M.D. Fla. Mar 17, 2009) No. 8:08-CV-471-T-TGW.

Both parties cite a case decided in this district in April, 2009. Harris v. Astrue, 2009 WL 1151740 (N.D. Fla. Apr 27, 2009), No. 4:08cv280-SPM/WCS. That case is distinguished because it concerned SSR 96-9p and a residual functional capacity determination of limited sedentary work. The case did not involve a residual functional capacity for light work.

This argument, therefore, relies upon an inapplicable Social Security Ruling and is not persuasive. The more important issue is whether the ALJ erred in finding that Plaintiff has the residual functional capacity to do a job that requires a good deal of walking and standing, with the option of standing, walking, and sitting at will.

**Whether the ALJ erroneously rejected the opinions of Dr. Emko and John K. McKay, Ph.D., and whether the ALJ erred by failing to discuss the opinion of Dr. Kadis**

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2). Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues. 20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips v. Barnhart, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986). "Where the Secretary has ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." *Id.* (emphasis added); Elam v. Railroad Retirement Bd.,

921 F.2d 1210, 1217 (11th Cir. 1991); <u>Critchfield v. Astrue</u>, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD). *Compare*, <u>Harris v. Astrue</u>, 546 F.Supp.2d 1267 (N.D. Fla. 2008) (No. 5:07cv44-RS/EMT) (remanding because the ALJ gave improper reasons to discount the opinion of a treating physician, but did not ignore it).[14] *But see,* <u>Cole v. Barnhart</u>, 436 F.Supp.2d 1239 (N.D. Ala. 2006) (finding that the opinions of the treating physician must be accepted as true where the ALJ "did not properly refute them.").

As noted above, on March 16, 2007, Dr. Emko said that he thought that Plaintiff had severe restrictions, that he could only sit for 15 minutes at a time, stand and walk for 20 to 30 minutes at a time, cannot bend, and cannot do any sort of work.  R. 78.  He explained that "the pain is too severe at this point and he stays medicated [with] pain meds."  *Id.*  Dr. Emko was a treating physician.

The Administrative Law Judge rejected this opinion.  R. 26.  He noted that on July 31, 2006, Plaintiff walked into Dr. Emko's office without a cane.[15]  *Id.*  He observed that when Plaintiff saw Dr. Emko on August 7, 2006, he was feeling better in general, and his back was "ok."[16]  *Id.*  He noted that on February 15, 2007, Plaintiff had "nonspecific tenderness in the right lower back.  *Id.*  He noted that on March 1, 2007,

---

[14] <u>Harris</u> distinguished <u>MacGregor</u> as a case where the ALJ made no finding as to the weight of the opinion of the ALJ, *i.e.*, he *ignored* the opinion.  786 F.Supp.2d at 1282.

[15] On August 15, 2006, Dr. Emko also said that Plaintiff had had left side pain all day and walked in with a cane.  R. 385.

[16] On September 11, 2006, Dr. Emko said that Plaintiff would see Dr. Macri, the neurologist, for his back problems but he also said that Plaintiff's back was "ok" that day.  *Id.*  R. 385.

Plaintiff walked into Dr. Emko's office with a cane and was assessed with chronic low back pain. *Id.* The ALJ concluded that Dr. Emko's opinion should be rejected "because the opinion is not well supported by medical acceptable clinical findings and lab diagnostic techniques, is inconsistent with other substantial medical evidence of record; and the opinion is conclusory and inconsistent with treatment notes." *Id.*

Plaintiff argues that this rejection of Dr. Emko's opinion was supported by post-surgical MRI reports demonstrating significant continuing spinal abnormalities and Plaintiff's history of pain despite multiple methods of pain management. Doc. 17, p. 17. Plaintiff also argues that Dr. Emko's opinion is consistent with the opinion of Dr. Kadis, the treating surgeon. *Id.*

Defendant argues that Dr. Emko's treatment notes made only passing reference to back pain during the visits, from July 31, 2006, to March, 2007, and Plaintiff only complained of back pain in the month or two before the March 16, 2007, opinion. Doc. 21, p. 10. Defendant points out that Dr. Emko did not perform any clinical tests, except to try a straight leg raising test on March 1, 2007, which Plaintiff could not do. *Id.* Defendant contends that "while Plaintiff is obviously factually correct that he had an abnormal MRI and a history of back injury, those facts did not require the ALJ to defer to Dr. Emko's opinion." *Id.*

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240-1241(11th Cir. 2004); <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir.

1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

There is nothing especially inconsistent between Dr. Emko's opinion as to Plaintiff's back pain disability and Dr. Emko's treatment notes.  While he twice said that Plaintiff's back was "ok," Dr. Emko's focus was that of a family practitioner who treated Plaintiff for blood pressure problems, intestinal pain, and similar problems, and referred Plaintiff to specialists for his back problems.  Still the lack of objective findings concerning the extent of Plaintiff's back impairment is some evidence to discount Dr. Emko's opinion.

But the substantial evidence test requires that all evidence in the record be considered.  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983) ("A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ.").  Defendant's argument that the admitted fact that Plaintiff had an abnormal MRI and a history of back injury "did not require the ALJ to defer to Dr. Emko's opinion" seems to be a misunderstanding of the substantial evidence rule of review and of Phillips v. Barnhart.  When that case said that a treating physician's opinion could be disregarded if "not bolstered by the evidence," it did not mean just the evidence in the treating physician's own records.  Consideration of "the evidence" means all of the evidence, not just the clinical findings in the treating physician's records.  After all, the court in Phillips v. Barnhart found it acceptable to

consider the testimony of the claimant as to the extent of her daily activities, evidence not in the treating physicians immediate records. 357 F.3d at 1241 and n. 9.

The most important clinical evidence was from Dr. Kadis, the surgeon and treating orthopedic physician, who had the longest period of treatment for Plaintiff's back problems. Dr. Kadis's records reveal that by August 31, 2005, after the two surgeries, Plaintiff had attended physical therapy 83 times, and was doing relatively well. This shows an extraordinary attempt to go back to work.

Things began to change for the worse for Plaintiff in the fall of that year. On October 3, 2005, Dr. Kadis reported that Plaintiff was "quite tender on the lateral aspect of his left hip." R. 303. On November 8, 2005, Dr. Kadis said that Plaintiff was having increasing amounts of low back pain radiating into his left buttock. R. 302. The MRI on November 11, 2005, revealed a central disk bulge with protrusion causing central canal narrowing and right-sided neural foraminal narrowing at L3-L4, and "some mild enhancing epidural scar tissue surround the exiting left L5 nerve root" that "may cause some of the patient's symptomatology." R. 248. On November 15, 2005, Dr. Kadis said that the MRI scan showed that Plaintiff had some lateral recess stenosis to the right at L3-L4. R. 302. While the fused area at L4-L5 looked "quite good," Dr. Kadis found that Plaintiff "does have some lateral encroachment to the right at L3-4." *Id.* On November 21, 2005, Dr. Kadis said that Plaintiff's pathology "has now begun to develop some symptoms above where he has had his previous surgery." R. 243. He said that Plaintiff was having increasing pain radiating into his hip and buttock. *Id.*

These clinical findings were the basis for Dr. Kadis's January 26, 2006, opinion. Dr. Kadis said that Plaintiff was "permanently disabled" from doing any his past relevant

work as a truck driver.  *Id.*  The diagnosis and basis for this opinion was lumbar

radiculopathy.  *Id.*

Dr. Kadis's opinion was rendered after Dr. Kadis had made a number of recent

objective clinical findings and had reviewed a new MRI that supported the opinion.  The

ALJ did not discuss Dr. Kadis's opinion at all.  This was error.

The error cannot be remedied now by Defendant's argument that Dr. Kadis's

opinion was conclusory.  Doc. 21, p. 12.  On administrative review of an action of an

agency of the Executive Branch, this court may not "substitute counsel's *post hoc*

rationale for the reasoning supplied by the" agency itself.  N.L.R.B. v. Kentucky River

Community Care, Inc., 532 U.S. 706, 715 n.1, 121 S.Ct. 1861, 1868 n.1, 149 L.Ed.2d

939 (2001), *quoting*, N.L.R.B. v. Yeshiva Univ., 444 U.S. 672, 685, n. 22, 100 S.Ct. 856,

63 L.Ed.2d 115 (1980) (citing Securities and Exchange Commission v. Chenery Corp.,

332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)[17]; Real v. Simon, 514

F.2d 738, 739 (5th Cir. 1975) (denying rehearing of Real v. Simon, 510 F.2d 557 (5th

---

[17] Chenery Corp. held:

> When the case was first here, we emphasized a simple but fundamental
> rule of administrative law.  That rule is to the effect that a reviewing court,
> in dealing with a determination or judgment which an administrative
> agency alone is authorized to make, must judge the propriety of such
> action solely by the grounds invoked by the agency.  If those grounds are
> inadequate or improper, the court is powerless to affirm the administrative
> action by substituting what it considers to be a more adequate or proper
> basis.  To do so would propel the court into the domain which Congress
> has set aside exclusively for the administrative agency.

Chenery Corp., 332 U.S. at 196, 67 S.Ct. at 1577.

Cir. 1975)); Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003); Fargnoli v.

Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001).

Dr. Kadis, however, did not say that Plaintiff was completely unable to do any

sort of work.  He only said that he was permanently disabled from returning to his work

as a tractor-trailer driver, a finding with which the ALJ agreed.  Still, this was important

evidence to consider when determining whether to credit the opinion of Dr. Emko or

Plaintiff's own testimony.  A person who cannot sit in a large truck all day long, working

foot and hand controls, is a person who might reasonably have some significant

problems doing light work and sedentary work.

Nor did the ALJ mention the July 20, 2006, opinion of Dr. Macri in connection

with his review of the opinion of Dr. Emko.  Dr. Macri agreed with a functional capacity

assessment that had been done on July 6, 2006, finding that Plaintiff could perform light

work for an eight hour day.  R. 397.  While this detracts from the opinion of Dr. Emko,

Dr. Macri also found that Plaintiff had a 28% total body impairment rating.  R. 398.  This

is a significant degree of impairment.  Further, Dr. Macri later augmented his findings

(on November 16, 2006), finding that Plaintiff still had radicular symptoms, mostly in his

left leg.  R. 395.  Dr. Macri ordered a new MRI.  *Id.*  Dr. Macri noted that Methadone did

not get rid of Plaintiff's pain.  *Id.*  Darvocet was prescribed.  *Id.*  These are strong pain

medications, indicative of a serious level of pain.

Moreover, Dr. Emko's own treatment notes in early 2007 are consistent with Dr.

Macri's findings in the fall of 2006, just a few months earlier.  On February 15, 2007, Dr.

Emko said that Plaintiff had had left side body pain for two weeks and low back pain,

and he ordered another MRI.  R. 384 and 388.  On March 1, 2007, Dr. Emko noted that

Plaintiff still had left leg and left side pain, used a cane, and could not do straight leg raising. R. 384. The February 22, 2007, MRI was much like the one on November 11, 2005, finding disc protrusion and bulging at L3-L4. R. 79. This is the same significant spinal defect that Dr. Kadis thought, in November, 2005, "may cause some of the patient's symptomatology." R. 248. In other words, the impingement revealed in these MRIs had remained the same throughout the entire period leading to Dr. Emko's opinion on March 16, 2007.

On October 23, 2006, the rehabilitation psychologist, Dr. McKay, rendered a lengthy opinion explaining why he did not think that Plaintiff was capable of performing any sort of work. R. 376. The ALJ assigned "no significant weight" to Dr. McKay's opinion, finding that it was "inconsistent with other substantial medical evidence of record," conclusory, and inconsistent with treatment notes.

Defendant argues that Dr. McKay was a consulting "physician," not a treating medical source. Doc. 21, p. 13. A consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given deference by the Commissioner. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987).

Dr. McKay was not a consultant in this sense. He examined and tested Plaintiff on March 10, 2005, December 9, 2005, September 12, 2006, and October 23, 2006. R. 376. He also saw him initially on December 9, 2004. R. 230. Thus, he had an adequate "longitudinal" experience of Plaintiff's back impairments as if he had been a treating source instead of an evaluative source. Dr. McKay's opinion was entitled to significant weight, and the reasons for not doing so should have been explained.

The ALJ did not explain why he found Dr. McKay's opinion to be "inconsistent with other substantial medical evidence of record" and inconsistent with treatment notes. That record is discussed above, and there are significant findings in the medical record to support Dr. McKay's opinion, just as it supported Dr. Emko's opinion. The ALJ did not explain why he thought Dr. McKay's opinion was "conclusory." It was a very lengthy opinion, and not conclusory in any sense of that word. As Plaintiff persuasively puts it:

> Dr. McKay's findings were based on a review of medical records, psychological testing, vocational analysis, and three interviews with Cooper over a two year period of time. (R. 375-80). By the time Dr. McKay issued his October 2006 report, Cooper had undergone two spinal surgeries with continuing spinal problems and scar tissue development, months of physical therapy just to be able to walk a quarter of a mile in less than 10 minutes, had been undergoing spinal injections for pain, [and] was using a TENS unit and morphine pump for pain. (R. 248, 302, 316, 321). Dr. McKay's four page opinion is neither conclusory nor inconsistent with the medical evidence.

Doc. 17, p. 18.

Defendant now argues that Dr. McKay performed no clinical evaluation of Plaintiff's functional limitations, and simply reported "a recital of Plaintiff's subjective complaints." Doc. 21, p. 13. Except for objective testing, that is what a psychologist does. A psychologist is trained to evaluate subjective reports from a patient. That Dr. McKay found that Plaintiff did not drink alcohol, did not smoke, impressed him as "a conservative family man who has been dislocated from the competitive labor market due to his impairments and for no other reason," had "an excellent work history," was honest, straightforward, sincerely wanted to work, and was not a malingerer, should

have merited more than a summary dismissal by the ALJ without discussion, especially since the ALJ was also required to evaluate the credibility of Plaintiff's testimony.

In summary, Plaintiff is correct.  The Administrative Law Judge did not give adequate reasons to discount the opinions of Dr. Emko and Dr. McKay, and he did not discuss the opinion of Dr. Kadis.  The court now must consider those opinions to be true.

### Whether the reasons given for finding Plaintiff not credible are supported by substantial evidence in the record

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce the *alleged* symptoms . . . ." R. 24 (emphasis added). An alleged symptom is a symptom as to which Plaintiff has testified. There was already clear evidence of "an underlying medical condition," the impingement at L3-L4 and the surgical changes at L4-L5 and in the neck region. Thus, had the ALJ been following this Circuit's pain standard, he would have stopped there. He found that the medically determinable impairments could reasonably be expected to produce the symptoms asserted by Plaintiff in his testimony, and there was already a medically determinable impairment. It was legal error, therefore, for the ALJ thereafter to decide he did not believe Plaintiff.

The ALJ wrote that he discredited Plaintiff because:

There is no mention of falling by the claimant to his treating neurosurgeons. There is no prescription for his use of a cane. His post-operative treatment notes indicate that he was walking, feeling better, and doing quite well.

R. 24. It is true that Plaintiff did not tell any treating physician about falling, but this is scant evidence to disbelieve Plaintiff. It is also true that in the eight or nine months after surgery, Dr. Kadis's medical notes indicated improvement. He was walking, feeling better, and doing quite well. But In August, 2005, after 83 physical therapy sessions, he had only achieved the goal of walking a quarter of a mile in less than or equal to 10 minutes, and the medical notes after August, 2005, show increasing back pain, inability to do straight leg raising tests, to climb on the examination table, and the like. It is true that no physician prescribed a cane, but then again, Plaintiff repeatedly appeared for treatment using a cane and none of his treating physicians told him to stop using it.

Further, Plaintiff's long term goal in physical therapy was to achieve a gait for community distances using a straight cane, thus indicating that the physical therapist thought that he needed a cane to walk.[18]  R. 330.  Finally, Plaintiff's pain testimony is fully supported by the opinions of Dr. Emko, Dr. McKay, Dr. Kadis, and Dr. Macri.  Since the ALJ failed to give reasons supported by substantial evidence in the record to discount Plaintiff's testimony, the court must now hold that it is true.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge did not correctly followed the law and was not based upon substantial evidence in the record.  The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the Commissioner **ORDERED** to grant Plaintiff's applications for benefits.

**IN CHAMBERS** at Tallahassee, Florida, on September 4, 2009.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[18] The vocational expert said that if Plaintiff had to use a cane to ambulate at work, his job base would be substantially eroded.

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.